IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

TRACY JONES

     Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO d/b/a Mercy Regional Medical Center, a Colorado Corporation, and

CENTURA HEALTH CORPORATION d/b/a Centura Health-Mercy Regional Medical Center of Durango,

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Now comes the Plaintiff, Tracy Jones, by and through counsel, and for her Complaint against Defendant states as follows:

## I. NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 ("Title VII"), and in violation of the Colorado Anti-Discrimination Act (CADA), and to provide appropriate relief to Plaintiff, who was discharged by Defendants because of her race and ethnicity. As alleged in greater detail below, Ms. Jones was hired by Defendants at Mercy Regional Medical Center (MRMC) as a Patient Service Representative on or about September 23, 2019 and performed her duties in a satisfactory manner. Defendants terminated Ms. Jones in retaliation for reporting discriminatory actions of fellow staff to Human Resources.

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the federal counts in this Complaint pursuant to 28 U.S.C. §§1331 and 1337 because they arise under the laws of the United States.

2. This Court has supplemental jurisdiction over the remaining state law causes of action pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because Plaintiff was employed and terminated in this District and the Defendants conduct business in this District at their location in Durango, La Plata County, Colorado.

## III. PARTIES

4. Plaintiff Tracy Jones is an adult woman who is African American and Native American. She was employed as a Patient Service Representative by Defendants from on or about September 23, 2019 until on or about July 1, 2021 and is a citizen of the State of Colorado.

5. Plaintiff is a covered and eligible employee as defined by defined by Title VII of the 1964 Civil Rights Act (Title VII, 42 U.S.C. §§ 2000e, *et seq.*), and the Colorado Anti-Discrimination Act (CADA, C.R.S. §§ 24-34-401.).

6. Defendant Catholic Health Initiatives Colorado d/b/a Mercy Regional Medical Center, (hereinafter "Defendant" or "MRMC") is a Colorado Corporation with its principal place of business at 9100 E. Mineral Circle, Centennial, Colorado 80112. Defendants operate a hospital in La Plata County, Colorado at 1010 Three Springs Boulevard, Durango, Colorado 81301 where it employed Plaintiff.

7. MRMC is an employer as defined by Title VII of the 1964 Civil Rights Act (Title VII, 42 U.S.C. §§ 2000e, *et seq.*), and the Colorado Anti-Discrimination Act (CADA, C.R.S. §§ 24-34-401.).

8. Centura Health Corporation d/b/a Centura Health-Mercy Regional Medical Center of Durango (hereinafter "Defendant" or "Centura") is a Colorado Corporation its principal place of business at 9100 E. Mineral Circle, Centennial, Colorado 80112. Defendants operate a hospital in La Plata County, Colorado at 1010 Three Springs Boulevard, Durango, Colorado 81301 where it employed Plaintiff.

9. Centura is an employer as defined by Title VII of the 1964 Civil Rights Act (Title VII, 42 U.S.C. §§ 2000e, *et seq.*), and the Colorado Anti-Discrimination Act (CADA, C.R.S. §§ 24-34-401.).

**DEFENDANTS ARE JOINT EMPLOYERS OR, IN THE ALTERNATIVE, A SINGLE INTEGRATED ENTERPRISE**

10. Based on information and belief MRMC and Centura exercised joint control over the operations and employees for one another, and these entities and their owners were always joint employers or a single integrated employer of Plaintiff relevant to the allegations contained in this Complaint.

11. The Defendants should be treated as a single integrated employer because their operations are interrelated, and they share centralized control over their labor relations.

12. A Human Resources representative from Centura was on the phone for many of the meetings and corrective actions with Ms. Jones.

13. Based on information and belief, a Human Resources representative from Centura was involved in many of the personnel decisions related to Ms. Jones's employment.

14. In addition, each corrective action, all relevant employment policies, and the employee handbook are labeled as Centura's policies, not specific to MRMC.

15. It was apparent to Ms. Jones that Defendants' decisions to discipline, respond to her complaints of discrimination, and ultimately terminate her employment were at least partially directed by Centura employees in Denver.

16. Upon information and belief, Defendants have common ownership or financial control.

17. In the alternative, if Defendants are not an integrated enterprise, then they are at least joint employers.

18. Centura directly and indirectly benefits from the work performed by MRMC employees who manage its hospital and clinics in Durango, Colorado.

19. The relationship between MRMC and Centura is permanent and existed prior to, during, and after the employment of the Plaintiff.

20. Based on information and belief, MRMC and Centura jointly determine, share, or allocate the power to direct, control, or supervise employees by direct or indirect means.

21. Based on information and belief, either formally or as a matter of practice, the joint employers jointly determine, share, or allocate the power to (directly or indirectly) hire, fire, or modify the terms and conditions of employees' employment, including compensation, through their shared HR representatives at Centura's location in Centennial, Colorado.

### III.     ADMINISTRATIVE PROCEDURES

22. More than thirty days prior to the institution of this lawsuit, Ms. Jones filed a charge with the Colorado Civil Rights Division (CCRD), which was dually filed with the EEOC, alleging violations of Title VII and CADA by Defendant Employer.

23. The CCRD provided Defendants with notice of the charges of discrimination.

24. The CCRD investigated the charges of discrimination.

25. Because more than 180 days passed since the charge was filed and because Plaintiff requested her right to sue letter, her charge was dismissed by the agency without issuing a determination on October 27, 2022.

26. All conditions precedent to the institution of this lawsuit have been fulfilled.

## IV. STATEMENT OF FACTS

27. On or about September 23, 2019, Plaintiff was hired by Defendants as a Patient Service Representative working in the Bayfield, Colorado clinic.

28. Plaintiff received two merit-based pay increases throughout her employment.

29. On or about the end of October or early November 2019, a patient asked Plaintiff questions about her race and ethnicity during a casual conversation and professional interaction. Plaintiff responded that she is African and Native American.

30. Shortly thereafter, Plaintiff was called into a meeting with her supervisors, Ms. Aimee Woods and Mr. Jeff Milanzo, and informed that a coworker was offended by the fact that Plaintiff disclosed her race (African) and ethnicity (Native America) in the workplace.

31. Plaintiff responded that "disclosing" her immutable traits could not possibly be offensive.

32. Ms. Woods responded that discussing race is equivalent to discussing politics and religion which is prohibited by Defendants' policies.

33. After this meeting, Ms. Jones walked straight to the Human Resources office and reported the incident to Ms. Gretchen Anaya-Quiroga, an Human Resources representative at MRMC in person.

34. Ms. Jones also asked if Defendants had a policy that prohibited an employee from disclosing their race/ethnicity at work.

35. Ms. Anaya-Quiroga responded by repeating Ms. Woods's outlook that disclosing one's race is equivalent to discussing politics and religion, which is prohibited. She was unable to produce a policy that specifically prohibited the disclosure of an employee's race or ethnicity.

36. On November 4, 2019 Plaintiff emailed Mr. Rod Crutcher, another Human Resources representative, to report the incident and attempt to further clarify Defendants' policies regarding disclosing and discussing race.

37. Mr. Crutcher responded reiterating that there are policies about not discussing politics and stated that discussing race was similarly controversial.

38. Based on information and belief, Defendants did not investigate Plaintiff's complaints about discrimination.

39. Based on information and belief, Defendants did not coach or discipline the employee who was offended by Plaintiff's race and ethnicity.

40. Plaintiff was confronted by Ms. Woods multiple times throughout December 2019 regarding her perfume and that it was offensive to coworkers. Plaintiff was not wearing perfume on any of those occasions.

41. Plaintiff felt immediately targeted by Human Resources and her supervisors because she vehemently stood up for herself in the face of the blatantly racist events at the end of October and November 2019.

42. At the beginning of Plaintiff's employment with Defendants she worked shifts at the Defendants' clinic in Bayfield, Colorado.

43. On or about January 23, 2020, Ms. Woods informed Plaintiff that she had offended coworkers at the Bayfield clinic when she commented that a co-worker's latte smelled like vanilla.

44. On or about January 29, 2020, Plaintiff was called to a meeting with her supervisor Ms. Woods about the alleged latte comment.

45. After the meeting, Plaintiff reported these incidents to Ms. Anaya-Quiroga in Human Resources stating that she felt they were discriminatory. Plaintiff also asked whether Defendants had a policy that allowed clinics to remove staff arbitrarily or for discriminatory reasons.

46. Ms. Anaya-Quiroga confirmed that clinics can remove staff for any reason they choose, even if they are or appear discriminatory.

47. A meeting was scheduled with between Plaintiff and Ms. Woods on or about January 29, 2020.

48. Because Plaintiff felt targeted based on her reporting of discrimination in 2019, she requested that Ms. Anaya-Quiroga from Human Resources be present because Plaintiff anticipated the conversation would relate to the earlier issue of discussing race in the office.

49. Plaintiff met with Ms. Woods and Ms. Anaya-Quiroga on January 29, 2020.

50. Plaintiff denied making the latte comment and felt that a meeting with a supervisor about such a ridiculous allegation was in and of itself discriminatory and retaliatory.

51. Woods and Anaya-Quiroga informed Plaintiff that they were permanently removing her from the Bayfield clinic without scheduling replacement positions with other clinics.

52. Plaintiff stated this would affect her pay and complained about the lack of conflict resolution.

53. Again Plaintiff told her supervisor and Human Resources that the Bayfield clinic's decision to remove her was discriminatory.

54. Plaintiff's complaint of ongoing discrimination made Ms. Woods and Ms. Anaya-Quiroga visibly upset.

55. Defendants did not investigate Plaintiff's complaints of discrimination regarding the latte comment and her subsequent removal from the Bayfield clinic.

56. Ms. Lisa Coash, a Caucasian woman, was Plaintiff's replacement at the Bayfield clinic.

57. Around the same time of Plaintiff's meeting with Ms. Woods and Ms. Anaya-Quiroga, Ms. Coash returned to the clinic where Plaintiff was now stationed and told Plaintiff that upon Ms. Coash's arrival at the Bayfield clinic, the staff stated they were relieved that Ms. Coash replaced Plaintiff because "we need people like us [Caucasian] here so we can say whatever we want to say."

58. Ms. Coash requested that she not be placed in the Bayfield clinic again due to the outwardly racist commentary by clinic staff.

59. On or about June 30, 2020, a white coworker approached Plaintiff and brought up the Black Lives Matter movement and white privilege. Ms. Jones did not seek out, provoke, or start this conversation about these topics.

60. Plaintiff engaged in the conversation as this was a topic she studied in college and saw it as an opportunity for a positive discussion.

61. In addition to her academic interest in the subject, Plaintiff is Native American and African American, so she identifies with the purpose, mission, and objective behind the Black Lives movement.

62. The coworker became progressively more upset, angry, and aggressive in her demeanor as the situation evolved upon receiving Ms. Jones's responses to her questions about the Black Lives Matter movement and white privilege, which she brought up.

63. By the end of the discussion the coworker was repeatedly yelling at Plaintiff, "Black Lives don't matter to me, all lives matter." Ms. Jones remained calm and tried to remove herself from the conversation without making the coworker more upset.

64. Plaintiff did not instigate, provoke, or incite any of the reactions of this coworker, who clearly was worked up about this issue before beginning the conversation.

65. It was also clear to Ms. Jones that the coworker was trying to get Ms. Jones to react and get upset so that she could get her in trouble.

66. The discussion ended with the coworker threatening to report Plaintiff to Human Resources.

67. Because of this threat, and the history of discrimination in the workplace, Plaintiff immediately reported the incident to her supervisor at the clinic as well as her supervisor, Ms. Woods.

68. Ms. Woods responded and called Plaintiff into a meeting that same day with the clinic supervisor.

69. The day after that incident, Plaintiff met with one of MRMC's Human Resources representatives who then joined a Centura Human Resources representative into the meeting by phone.

70. The Centura Human Resources representative informed Ms. Jones that she would be conducting an investigation into the incident.

71. Besides her initial report to Human Resources, Plaintiff was never interviewed during the course of the investigation. Defendants never asked Plaintiff for her perspective or account of the events or details of the discussion on June 30.

72. On July 15, 2020, approximately two weeks after the Black Lives Matter conversation and Plaintiff's report of discrimination and harassment, Defendants gave Plaintiff two Corrective Actions without any warning.

73. This was the first time Plaintiff had heard anything negative about her performance or been informed of the issues for which she was disciplined.

74. One Centura Corrective Action was for alleged absenteeism. Plaintiff responded to some of the absences and had legitimate explanations showing they were not violations of policy, but Defendants refused to listen to or consider her position and explanation.

75. For instance, on multiple occasions, Ms. Woods would change the location of Plaintiff's shift in the morning, which would cause Plaintiff to be late due to the drive to the new location; these instances were used to justify Ms. Woods's warnings regarding Plaintiff's absences.

76. Additionally, Plaintiff is the primary caregiver for her mother, who suffers from long-haul COVID-19, diabetes, kidney failure, and Alzheimer's.

77. Defendants were aware of Plaintiff's mother's disabilities and that Plaintiff was the primary caregiver for her mother.

78. Defendants knew that Plaintiff was late for work sometimes or had to call off at the last minute to care for her mother.

79. Plaintiff was told this was not a problem, and she was never disciplined nor warned about these instances when they occurred and was not disciplined until she complained about discrimination.

80. The second Centura Corrective Action was for excessive cell phone use, among other miscellaneous issues, and for "lack of respect." Plaintiff denied these allegations.

81. On July 27, 2020 Ms. Woods called Plaintiff into another meeting and informed her that the investigation into the June 30, 2020 Black Lives Matter conversation and report of discrimination and harassment was finished.

82. Also present at this meeting was Ms. Gjedde and a Human Resources representative from Centura on video conference.

83. The Human Resources person on video conference ran the meeting and did most of the talking.

84. Ms. Woods handed Plaintiff a Centura Corrective Action Plan and the Human Resources representative explained that it was because Plaintiff "participated in an unprofessional conversation in an area of the building that is frequented by patients as well as Centura associates. The nature of the conversation was inappropriate and led to a contentious disagreement between Tracy [Plaintiff] and the other associate."

85. They told Plaintiff that she should have walked away and not engaged with her coworker.

86. This was the second time Plaintiff had been verbally coached for discussing her race in response to another person's inquiry in the workplace.

87. Plaintiff opposed this disciplinary action by defending her actions during the meeting and by trying to explain again that the coworker approached her and became hostile, but both Human Resources representatives became visibly upset with her for challenging the decision.

88. The Human Resources person on video conference was very agitated throughout the meeting and repeatedly yelled at Ms. Jones, "Do you understand what I'm saying."

89. Plaintiff also wrote comments on the Centura Corrective Action Plan above her signature stating in part, "I am being punished for the behaviors of another associate."

90. On or about September 2020, Ms. Woods was moved to a new position and was no longer Plaintiff's supervisor.

91. From September 2020 until May 2021, Plaintiff received a pay increase and was never disciplined, warned, or coached about any performance issues.

92. Defendants returned Ms. Woods to her former position as Plaintiff's supervisor on or about the end of March 2021.

93. Shortly after Ms. Woods's return, on or about May 4, 2021, Defendants gave Plaintiff another written warning for the same items discussed in the meeting in July 2020.

94. Again, Plaintiff disputed and objected to the Corrective Action Plan.

95. Plaintiff filed a complaint of discrimination in June 2021 by calling Defendants' complaint hotline.

96. Plaintiff stated that she felt the warnings by Ms. Woods were discriminatory and retaliatory based on her race/ethnicity.

97. The hotline informed Plaintiff that a report would be submitted to Human Resources.

98. Sometime in May/June Plaintiff's mother was put into the hospital due to complications from long-haul COVID-19.

99. Plaintiff asked her on-shift supervisor what she should do to take time off to care for her mother.

100.    Plaintiff was advised to use her accrued paid sick days under the HFWA.

101.    Defendants never offered Plaintiff Public Health Emergency (PHE) leave to which she was entitled to under the Healthy Workers and Families Act.

102.    Plaintiff took three of her accrued sick leave days to care for her mother, which exhausted her accrued paid sick leave.

103. On June 29, 2021 at 7:04 a.m., Plaintiff informed Defendants via the Sling app that she was sick the night before and not feeling better that morning. She asked what she should do because she did not want to be fired for not coming to work but did not want to come to work sick.

104. On June 29, 2021 at 7:18 am, Ms. Gjedde responded to Plaintiff's Sling text by stating, "we cannot have you in the clinic since you have disclosed that you have been vomiting."

105. If Plaintiff had been given the PHE leave under the HFWA to which she was entitled, she would have had access to her accrued paid sick time for June 29, 2021.

106. On June 29, 2021 at 1:43 pm Ms. Gjedde sent a Sling text to Plaintiff informing her that all of her upcoming shifts were being removed and that Human Resources was determining what level of Corrective Action to issue because she was sick and was told not to come in to work.

107. On July 1, 2021 Defendants terminated Plaintiff's employment because she did not come to work on June 29, 2021 because she was sick despite the fact that she did not come in at Defendants' instruction.

108. Ms. Anaya-Quiroga and Ms. Gjedd were in the meeting when Ms. Jones was terminated. They told Plaintiff that they met with Human Resources and felt like there was a pattern and this was the decision they reached.

109. Ms. Jones responded and told them that she felt that this was discriminatory.

110. They told Ms. Jones that there was a pattern because she called in when she couldn't come into work. She clarified that she had called to clarify what she should do because she was sick.

111. During her termination, Defendants' Human Resources representatives, Ms. Anaya-Quiroga and Ms. Gjedde, acknowledged that there was an open and ongoing investigation

13

into Plaintiff's complaint of discrimination and retaliation and that if the information was founded, Defendants would reconsider the decision to terminate Plaintiff's employment.

112. Plaintiff was not held to the same standards as similarly situated white, non-Native employees who did not complain about discrimination or retaliation.

113. Defendants were aware at all times that Plaintiff was the sole caretaker of her mother who suffers from long-haul COVID-19 and Alzheimer's.

114. Plaintiff's absences due to caring for her mother were not questioned by Defendants until after Plaintiff made reports of discrimination.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Discrimination, Harassment and Hostile Work Environment because of Race and Ethnicity in violation of Title VII of the 1964 Civil Rights Act – 42 U.S.C. §§ 2000e, *et seq.*)**

115. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

116. Plaintiff is African American and Native American.

117. Plaintiff was fully qualified for her position.

118. Defendants at all relevant times, knew that Plaintiff was being subjected to ongoing harassment related to her race and ethnicity.

119. During Plaintiff's tenure with Defendants, Defendants treated Plaintiff less favorably than similarly situated non-African and Native American employees, failed to protect Plaintiff from the discriminatory conduct of her coworkers and direct supervisors, and terminated her employment on account of her race and ethnicity.

120. Defendants' conduct was intentional, willful, wanton, and malicious.

121. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury and damage for which she is entitled to compensation pursuant to the Title VII of the Civil Rights Act of 1964.

122. Because of Defendants' unlawful conduct, Plaintiff is entitled to judgment in her favor, and substantial economic, non-economic and punitive damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Discrimination and Harassment because of Race and Ethnicity in violation of the Colorado Anti-Discrimination Act – C.R.S. §§ 24-34-401, *et seq.*)**

123. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

124. Plaintiff is African American and Native American.

125. Plaintiff was fully qualified for her position.

126. Defendants at all relevant times, knew that Plaintiff was being subjected to ongoing harassment related to her race and ethnicity.

127. During Plaintiff's tenure with Defendants, Defendants treated Plaintiff less favorably than similarly situated non-African American and non-Native American employees, failed to protect Plaintiff from the discriminatory conduct of her coworkers and direct supervisors, and terminated her employment on account of her race and ethnicity.

128. Defendants' conduct was intentional, willful, wanton, and malicious.

129. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury and damage for which she is entitled to compensation pursuant to the Colorado Anti-Discrimination Act.

130. Because of Defendants' unlawful conduct, Plaintiff is entitled to judgment in her favor, and substantial economic, non-economic and punitive damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
**(Retaliation in violation of Title VII of the 1964 Civil Rights Act – 42 U.S.C. §§ 2000e, *et seq.*)**

131. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

132. Plaintiff engaged in protected opposition to Defendants' ongoing discriminatory harassment and hostile work environment.

133. Defendants disciplined and then terminated Plaintiff's employment only after Plaintiff engaged in opposition to Defendants' unlawful employment practices.

134. Plaintiff suffered adverse employment actions because of her opposition to Defendants' unlawful employment practice.

135. Defendants' conduct was intentional, willful, wanton, and malicious.

136. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered injury and damage for which she is entitled to compensation pursuant to Title VII of the 1964 Civil Rights Act.


## FOURTH CAUSE OF ACTION
**(Retaliation in violation of the Colorado Anti-Discrimination Act – C.R.S. §§ 24-34-401, *et seq.*)**

137. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

138. Plaintiff engaged in protected opposition to Defendants' ongoing discriminatory harassment and hostile work environment.

139. Defendants disciplined and then terminated Plaintiff's employment shortly after Plaintiff engaged in opposition to the unlawful employment practice.

140. Plaintiff suffered adverse employment actions because of her opposition to Defendants' unlawful employment practice.

141. Defendants' conduct was intentional, willful, wanton, and malicious.

142. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered injury and damage for which he is entitled to compensation pursuant to the Colorado Anti-Discrimination Act.

**FIFTH CAUSE OF ACTION**
**(Discrimination because of Association with a Disabled Person in violation of the ADA and ADAAA – 42 U.S.C. §§ 12101, *et seq.*)**

143. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

144. Plaintiff's mother has a physical disability as defined by law.

145. Plaintiff is her mother's primary caregiver.

146. At all relevant times, Plaintiff was qualified for her position.

147. At all relevant times, Defendants knew or should have known of Plaintiff's relationship and association with her mother.

148. At all relevant times, Defendants knew or should have known of Plaintiff's mother's physical disabilities.

149. Plaintiff suffered adverse employment actions, in part, because of her association with her disabled mother.

150. Defendants' conduct as alleged above constitutes wrongful discharge because of her relationship and association with a disabled person in violation of the ADA and the ADAAA.

151. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer injury and damage for which she is entitled to compensation pursuant to the ADA and ADAAA.

**SIXTH CAUSE OF ACTION**
**(Retaliation in violation of the ADA and ADAA – 42 U.S.C. §§ 12101, *et seq*.)**

1. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

2. Plaintiff engaged in protected opposition to Defendants' unlawful employment practice of discriminating because of her relationship and association with a person with a disability.

3. Defendants terminated Plaintiff's employment shortly after Plaintiff engaged protected activity of taking time off to care for her disabled mother.

4. Defendants terminated Plaintiff's employment shortly after Plaintiff engaged in opposition to Defendants' unlawful employment practice.

5. Plaintiff suffered adverse employment actions because of her protected activity and opposition to Defendants' unlawful employment practice.

6. Defendants' conduct was intentional, willful, wanton, and malicious.

7. As a direct and proximate cause of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer injury and damage for which she is entitled to compensation pursuant to the ADA and ADAAA.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants and prays for:

A. Compensation for the loss of all the income, benefits, and privileges incurred from on or about July 1, 2021 through the date of reinstatement or trial, as well as reasonable front pay, which amount cannot yet be ascertained;

B. Other compensatory damages, including but not limited to compensation for damage to Plaintiff's reputation, emotional distress suffered because of Defendants' unlawful

conduct, and all other noneconomic damages Plaintiff so incurred;

C. Prejudgment interest and post-judgment interest;

D. Punitive damages;

E. Reasonable attorney fees incurred in this action, pursuant to federal and state law;

F. The costs of this action; and,

G. Any further relief provided by statute or law and that the Court deems just or equitable.

## VI. JURY TRIAL DEMAND

Plaintiff requests a trial by jury.

Dated this 14th day of December, 2022.

By: s/ Eleni K. Albrechta
*Eleni K. Albrechta, esq.*
*David T. Albrechta, esq.*
ALBRECHTA & ALBRECHTA, LLC
530 Main Avenue, Suite D3
Durango, Colorado 81301
Telephone: (970) 422-3288
E-mail: david@albrechtalaw.com
          eleni@albrechtalaw.com

*Attorneys for Plaintiff*